Filed 7/5/22  P. v. Martinez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077001 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN393204) |
| ISSAC MARTINEZ, | |
| Defendant and Appellant. | |

APPEALS from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Martinez's appeal affirmed in part, reversed in part and remanded with directions; People's appeal reversed and remanded with directions.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

A jury found Issac Martinez guilty of one count of murder (Pen. Code, § 187, subd. (a))[1] and found that the murder was in the first degree. During the trial, the People presented evidence that Martinez committed the murder with a minor, J.M. and that both J.M. and Martinez were members of the same criminal street gang.[2]

The jury further found that Martinez: (1) committed the offense for the benefit of, or in association with, a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1); (2) intentionally and personally discharged a firearm and proximately caused great bodily injury and death to a person, within the meaning of section 12022.53, subdivision (d); and (3) was a principal in the murder, and in the commission of the murder, at least one principal personally and intentionally discharged a firearm and proximately caused great bodily injury and death to another person, within the meaning of sections 12022.53, subdivision (d) and 12022.53, subdivision (e)(l).[3]

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2] J.M. was not a defendant in this proceeding.

[3] At times throughout this opinion, we refer to the section 186.22, subdivision (b)(1) enhancement as a "gang enhancement," the section 12022.53, subdivision (d) enhancement as a "personal use firearm enhancement," and the section 12022.53, subdivisions (d) and (e)(l) enhancement as a "firearm / gang enhancement."

After the jury returned its verdicts, the trial court found true an allegation that Martinez previously suffered a juvenile adjudication that constituted a strike. Martinez filed a motion asking the trial court to reconsider that ruling. The trial court subsequently reversed its strike finding and determined that the People had not established that the prior juvenile adjudication constituted a strike.

The trial court sentenced Martinez to an aggregate sentence of 50 years to life in prison, consisting of 25 years to life for the first degree murder conviction, and an additional consecutive term of 25 years to life for the personal use firearm enhancement (§ 12022.53, subd. (d)). The trial court imposed an additional term of 25 years to life for the firearm / gang enhancement (§ 12022.53, subds. (d) and (e)(1)) but stayed execution of that sentence pursuant to section 654. Finally, the court stated that, in light of the indeterminate term that it imposed for the murder conviction, the gang enhancement finding (§ 186.22, subd. (b)(1)) had no effect on Martinez's sentence.

In his appeal, Martinez claims that the trial court erred in denying his pretrial motion to exclude his surreptitiously recorded jailhouse statements, arguing that the admission of these statements violated his constitutional right not to incriminate himself and his right to due process.[4] Martinez also claims that the gang enhancement true finding (§ 186.22, subd. (b)(1)) and the related firearm / gang enhancement true finding (§ 12022.53, subds. (d) and (e)(l)) must be reversed due to a retroactive change in the statutory

___

[4]    The parties refer to the police operation pursuant to which the People obtained Martinez's statements by surreptitiously recording a jail conversation between Martinez, an undercover detective and a cooperating individual, as a "*Perkins* operation." (See *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).)

scheme governing gang enhancements. (See Stats. 2021, ch. 699, § 3, eff. Jan. 1, 2022 ("A.B. 333").)[5] He requests that the matter be remanded to the trial court to permit the People to retry the gang enhancement and firearm / gang enhancement allegations under the new law, if they choose to do so.[6] Martinez also requests that this court review J.M.'s sealed school records to determine whether Martinez was provided with all of the documents to which he was entitled in pretrial discovery. Martinez further asks this court to review the sealed record of an in camera hearing pertaining to his request to disclose the identity of a cooperating individual involved in the *Perkins* operation, to determine whether the trial court properly exercised its discretion in denying Martinez's request to disclose the cooperating individual's identity.[7] Martinez also maintains that the trial court violated

---

[5] Martinez does not raise any claim as to the personal use firearm enhancement true finding (§ 12022.53, subd. (d)) premised on the jury's finding that Martinez intentionally and personally discharged a firearm and proximately caused great bodily injury and death to a person.

[6] Martinez raised this claim in a supplemental letter brief filed while this appeal was pending. In their supplemental responding brief, the People concede that the new law applies retroactively. The People further concede that application of the law mandates reversal of the gang enhancement finding (§ 186.22, subd. (b)(1)) and the related firearm / gang enhancement finding (§ 12022.53, subds. (d) and (e)(l)) and remand to the trial court with directions to permit the People to retry the gang enhancement and firearm / gang enhancement allegations, if they chose to do so.

[7] As discussed in part III.A.1.b.ii, *post*, the *Perkins* operation was conducted by an undercover agent who testified at Martinez's trial and by a civilian cooperating individual, who did not testify. A video recording of the *Perkins* operation was shown at trial. The faces of the undercover agent and the cooperating individual are obscured in the video and, as discussed in part III.A.4, *post*, the trial court denied Martinez's request to disclose the cooperating individual's identity.

4

his constitutional rights in imposing various fines and fees without first determining his ability to pay such fines and fees and that his counsel was ineffective in failing to request a hearing on his ability to pay. Finally, Martinez requests that we correct the judgment to state the proper number of days of custody credits to which he is entitled and that we direct the trial court to correct the abstract of judgment to state the proper recipient of a restitution order.

In their appeal, the People claim that the trial court erred in determining that Martinez's prior juvenile adjudication is not a strike.

With respect to Martinez's appeal, we affirm the first-degree murder conviction. We accept the People's concession that we must reverse the jury's true findings on the gang enhancement and the firearm / gang enhancement allegations in light of changes in the law, and remand the matter to permit the People to retry these allegations if they so choose.[8]

With respect to the People's appeal, we conclude that Martinez is estopped from contending that his prior juvenile adjudication is not a strike. We further conclude that the trial court erred in determining that Martinez's juvenile adjudication is not a strike and that the matter must be remanded for resentencing.

---

[8] In his opening brief, Martinez also contended that there was insufficient evidence to support the jury's true findings on the gang enhancement allegation (§ 186.22, subd. (b)(1)) and the related firearm / gang enhancement allegation (§ 12022.53, subds. (d) and (e)(l)) under the law as it existed prior to A.B. 333. We need not consider these contentions in light of our reversal of the jury's true findings on these allegations due to the change in the law.

At the conclusion of Martinez's resentencing, the trial court shall state the proper number of custody credits to which Martinez is entitled and shall prepare a new abstract of judgment to state the proper recipient of the court's restitution order.[9]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The People's evidence*

1. *The murder*

At approximately 2:25 p.m., on November 4, 2018, 20-year-old Jonathan Ruiz and two of his friends decided to climb a path up a steep shrub covered hillside to Vista Manor, a mobile home park located in Vista. The path was narrow, so the group climbed it single file, with Ruiz in the lead and his two friends trailing him.

Martinez and J.M. were at the top of the hill. As Ruiz walked up the hill, Martinez pulled out a gun and pointed it at Ruiz. Martinez shot Ruiz twice, killing him.

That afternoon, a man and his wife were visiting some family members who lived near the location of the shooting. While the couple were on the porch of the house, they heard two gunshots. They then saw two males running down the street. The older of the two males, later determined to be Martinez, was wearing a dark shirt and holding a gun. The man and his wife saw Martinez drop the gun into a trash can. The wife recorded a brief video on her cell phone of the two males, which the People played at trial. The video depicts the two males running down the street. The male dressed in

---

[9] Because we are remanding for resentencing, we need not consider Martinez's claims as to the trial court's imposition of various fines and fees during his sentencing hearing.

6

dark colors pauses while running and appears to put something in a trash can before running out of sight in the same direction as the other male.

Another woman who lived near the murder scene saw "two guys" running down the street in a zig zag pattern toward her residence. The woman estimated that they were between 17 and 20 years old. Shortly after seeing the males, she heard the sound of an object being dropped into her trashcan. She asked one of the males, who was wearing a dark shirt and a baseball cap, later determined to be Martinez,[10] what he was doing. Martinez responded, "[M]a'am, please don't say anything." Martinez continued running. The other male, who was wearing a white t-shirt, continued running in the same direction as Martinez. Shortly thereafter, the woman and her husband discovered a black gun in their trashcan.

2. *The murder weapon*

Police determined that the gun found in the trashcan was the murder weapon.

A mixture of Martinez's DNA and J.M.'s DNA was found on the gun. Martinez's DNA was also found on the magazine of the gun.

A latent print of Martinez's right ring finger was found at the bottom of the gun's barrel, and a latent print of Martinez's left thumb was found on the magazine inside the gun.

3. *Martinez's statements made during the* Perkins *operation*

Nine days after the murder, police arrested Martinez and took him to jail. As discussed in greater detail in part III.A.1, *post*, while in jail, Martinez told an undercover detective and a cooperating individual, who were posing as fellow inmates, that he had committed the murder. Martinez

---

[10] The woman was not able to identify either of the males she had seen running near her residence.

explained that he killed Ruiz because Ruiz and some of Ruiz's friends had fought with Martinez during an incident that occurred approximately a month before the shooting. Martinez explained that during the prior fight, he was accompanied by his younger brother and his "homies."[11]

### 4. *Gang expert evidence*

The Vista Homeboys (VHB) is the only gang in Vista. It has approximately 200 documented members. VHB claims the entire city of Vista as its turf. The primary activities of the gang include assault with a deadly weapon, armed robbery and murder.

Martinez and J.M. are members of VHB.

The People's gang expert stated that in his opinion, a murder committed in the manner that the murder in this case was committed would have been done for the benefit of a gang.

### B. *The defense*

The defense presented a gang expert who reviewed the video and transcript of the *Perkins* operation. According to the expert, given the circumstances of the operation, a young Hispanic gang member would have felt compelled to respond to the cooperating individual's questions concerning the offense. In addition, the expert stated that the gang member would feel compelled to embellish his role in the crime in order "to appear solid." This could include saying that he had killed a person whom he had not actually killed.

---

[11] The People presented evidence that Martinez's brother was also a VHB gang member and that the word "homie," was a slang term for "someone that's a part of the gang."

During her closing argument, defense counsel argued that J.M. had shot and killed Ruiz and that Martinez was not part of "any plan to do so."

## III.

## DISCUSSION

A. *Martinez's appeal*

1. *The trial court did not err in denying Martinez's motion to exclude his jailhouse statements made during the Perkins operation.*

Martinez claims that the trial court erred in denying his motion to exclude recorded jailhouse statements that he made during the *Perkins* operation. These statements include an admission that Martinez committed the murder.

Martinez contends that the trial court's admission of the statements violated his fifth amendment right against self-incrimination guaranteed by *Miranda*[12] and its progeny. Martinez further maintains that admission of the statements violated his fourteenth amendment right to due process because his statements were not " 'given freely' " but rather, were obtained through "sustained coercive tactics."

a. *Standard of review*

" 'In reviewing the trial court's denial of a suppression motion on *Miranda* . . . grounds, " ' "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged

---

12      *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

statement was illegally obtained." ' " [Citations.]' " (*People v. Jackson* (2016) 1 Cal.5th 269, 339.) Similarly, "[v]oluntariness is a legal question subject to independent review; a trial court's related factual findings are upheld if supported by substantial evidence." (*People v. Winbush* (2017) 2 Cal.5th 402, 452 (*Winbush*); see also *People v. McWhorter* (2009) 47 Cal.4th 318, 346 (*McWhorter*) [" ' "When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness" ' "].)

### b. *Factual and procedural background*

#### i. *Events prior to the* Perkins *operation*

Nine days after the murder, Martinez went to the Vista courthouse in connection with a different matter. While he was at the courthouse, police arrested him.

Two detectives interviewed Martinez. After a detective advised Martinez of his *Miranda* rights, Martinez initially agreed to speak with the detectives and denied having committed the murder. However, after a detective showed Martinez photographs of Martinez, J.M. and another individual near the scene of the shooting and accused Martinez of committing the shooting, Martinez requested an attorney. Immediately thereafter, a detective said, "So look at this- so this right here is you and [J.M.] running down the street." Martinez responded, "Oh, well I'm gonna [*sic*] need my attorney." Shortly thereafter, the detectives terminated the interview.

Later that same day, police conducted the *Perkins* operation.

## ii. *The* Perkins *operation*[13]

Police placed Martinez in a jail cell in which the cooperating individual and the undercover detective were sitting.[14] When Martinez entered the cell, the cooperating individual asked Martinez, "Where are you from homie?" Martinez responded, "Blanco, Vista Homeboys." Shortly thereafter, Martinez said "they got me for a hot one dawg."[15] The cooperating individual told Martinez that he was in a "gangster room" where all of the inmates had been charged with murder.

Shortly thereafter, Martinez revealed that he was new to the adult criminal system. The cooperating individual told Martinez about prison life in detail, including that he should "always respect the next man," because "[y]ou don't know who's the next killer." The cooperating individual also said that Martinez would be expected to "put in a little bit of work," while he was incarcerated and that his fellow gang members might ask him to "handle

---

[13]    We quote from the transcript of the video recording of the *Perkins* operation included in the record. Several of the statements on the video recording are in Spanish, and the transcript contained in the record contains both the Spanish statements and their English translation. We quote from the transcript's English translation. At trial, the trial court instructed the jury that, with respect to words spoken in Spanish, the English translation constituted evidence in the case, whereas words spoken in English, "what you hear and see," constituted the evidence.

[14]    At trial, the parties stipulated that the cooperating individual had prison and gang tattoos on his hands, arms, and neck, including the tattoo "SUR" on one of his hands. The undercover detective who participated in the *Perkins* operation, San Diego Sheriff's Department Detective Manuel Heredia, testified at trial. Detective Heredia explained that "SUR" stands for the Surenos prison gang, also known as the Mexican Mafia.

[15]    According to Detective Heredia, a "hot one" usually refers to a serious crime, like murder.

business," which, the cooperating individual added, was something that Martinez had "already signed up for," since he was a gang member.

The cooperating individual also told Martinez that he should be prepared for questioning about his case, telling him, "I strongly suggest that you . . . start figuring out your little stories . . . before they come and investigate." After the cooperating individual began telling Martinez about how detectives had purportedly shown another inmate a picture of the person the inmate had murdered, Martinez started to talk about the photographs that the detectives had shown him related to the Ruiz murder.

Martinez described the Ruiz murder in detail, including telling the cooperating individual and the undercover detective that Martinez was with another "homie" at the time of the shooting, the "homie" knew that Martinez had a gun, Martinez committed the shooting in retaliation for a prior fight between Martinez and Ruiz, Martinez shot Ruiz twice, Martinez committed the shooting with a "9," the police had a photograph of "the back of us when we took off," the police showed Martinez a photograph of the gun that he had used to commit the shooting; and Martinez had thrown the gun into a trashcan as he fled the scene of the shooting.

After the cooperating individual told Martinez that it appeared to be an "open and shut case," Martinez and the cooperating individual began to discuss the number of years that Martinez could expect to spend in prison. After the cooperating individual said that it "doesn't look like a fifteen," Martinez responded, "It's looking like a twenty, hah? More? Thirty?"

The cooperating individual responded by noting that someone had died and shortly thereafter added, "But gang related, my boy." Martinez responded, "Yeah, I know. . . ."

After Martinez stated, "I'll do fifteen," the cooperating individual said, "We're gang members, dawg. We did a murder, dawg. You know? For the barrio (hood)- it is what it is, homie. It's the life we chose dawg." Martinez responded, "You know."

After the cooperating individual left the cell, Martinez described his prior fight with Ruiz to the undercover detective. Martinez explained that he had been walking with his brother "and a few younger homies," when they were chased by Ruiz and some other guys. During an ensuing fight, one of the people Ruiz was with hit Martinez in the back of the head with a crowbar. Ruiz also "sliced" Martinez during the fight.

Martinez explained that the initial disagreement with Ruiz had begun one day when Martinez was in "my park area," and Ruiz had been "staring" at him. A dispute ensued. In describing the incident, Martinez told the undercover officer, "But I was like- what the fuck? Fuck that shit. You know this is my hood . . . ." Martinez explained that Ruiz's group had "tried to go against the whole hood, dawg." The undercover officer asked, "And what about your hood? Are they strong fighters too?" Martinez responded, "Yeah," and added "[t]here are about forty of them there right now . . . ."

iii.  *Martinez's motion to exclude his statements*

Prior to the trial, Martinez filed a motion to exclude the statements that he made during the *Perkins* operation. In a supporting brief, Martinez argued that his statements should be suppressed because they were obtained in violation of *Miranda* and that the admission of his statements would violate Martinez's fifth amendment right not to incriminate himself. Martinez also argued that his constitutional right to due process required suppression of the statements because the statements were the product of coercive police activity and were not made voluntarily.

13

The People filed an opposition to Martinez's motion. In their opposition, the People argued that admission of Martinez's statements to persons whom Martinez believed to be "fellow gang members," did not violate either *Miranda* or Martinez's fifth amendment right against self-incrimination. Citing several California cases, the People argued that *Miranda* was not violated because "the elements of a police custodial interrogation" were not present in the *Perkins* operation. The People further argued that there were no "circumstances surrounding the undercover operation [that] render[ed] the situation coercive." The People contend, "it is clear [Martinez's] will was not overborne and he was not coerced."

iv. *The trial court's ruling admitting the statements*

After a hearing, the trial court denied Martinez's motion. The trial court reasoned in part:

> "What the courts are telling us is that *Miranda* does not apply to a conversation held between inmates who are in custody together, even if the inmates, unbeknownst to the defendant, are an undercover officer and a confidential informant.
>
> "I do believe the people cited several cases saying that if even there was a prior invocation, it doesn't affect the analysis. . . .
>
> "[¶ . . . ¶]
>
> "Since *Miranda* does not cover the *Perkins* operation, the fact that he previously invoked I don't think is relevant to the question. So[,] then the defense goes next to coercion, which would be independent of *Miranda* and would always be an analysis required for any statement that is taken. I did listen to the audiotape, watched the video, read the transcript that was presented earlier in the motion to have the confidential individual's identity be revealed, which the court previously denied."

14

After summarizing portions of the recorded statements, the court stated:

> "Listening to the conversation, again, I just didn't pick up anything that was remotely a threat. The defendant's tone, his interaction seemed to be very voluntary, very engaged in the conversation. They were joking in the conversations, as well. So[,] I don't believe there were any threats.
>
> "It would be a coercive situation and not a voluntary statement if there was an expressed or implied threat. In this case, I don't find that there were any expressed or implied threats to the defendant."

After providing additional analysis of the statements at issue and reviewing relevant case law, the trial court denied Martinez's motion to suppress, stating:

> "So for those reasons, I don't think the statements that were obtained while the defendant was in custody with the undercover officer and the cooperating individual[ ] are to be suppressed for either the fifth amendment, voluntariness, or under *Miranda*."

### v. *The use of Martinez's statements at trial*

The People played a video of the *Perkins* operation at trial. In addition, Detective Heredia testified concerning the *Perkins* operation and the statements that were made by the participants during the operation, including the meaning of various slang terms.

During his closing argument, the prosecutor repeatedly referred to Martinez's admissions made during the *Perkins* operation in urging the jury to find Martinez guilty. The prosecutor also played portions of the video of the *Perkins* operation during her closing argument.

15

c. *The trial court's admission of Martinez's statements did not violate his fifth amendment right against compulsory self-incrimination*

Martinez claims that the trial court violated his fifth amendment right against compulsory self-incrimination in denying his motion to exclude the statements that he made during the *Perkins* operation. In making this argument, Martinez stresses that he had invoked his right to counsel *prior* to making the statements in the *Perkins* operation.[16]

i. *Governing law*

The Fifth Amendment of the United States Constitution provides a criminal defendant with a privilege against compulsory self-incrimination. (U.S. Const., 5th Amend. ["nor shall [any person] be compelled in any criminal case to be a witness against himself"].)

"*Miranda* . . . and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed. [Citations]." (*People v. Gamache* (2010) 48 Cal.4th 347, 384.)

In *Perkins*, the United States Supreme Court considered whether an undercover agent posing as an inmate was required to provide *Miranda* warnings to a suspect before soliciting statements from the suspect that could be admitted at the suspect's trial. (*Perkins, supra*, 496 U.S. at p. 294.) The *Perkins* court concluded that the suspect's statements to the undercover agent were admissible notwithstanding that the undercover agent had not provided the suspect with *Miranda* warnings prior to obtaining his

[16] Martinez does not contend that his Sixth Amendment right to counsel was violated.

statements. (*Ibid.*) The *Perkins* court summarized the circumstances under which the suspect made the statements at issue and its holding as follows:

> "An undercover government agent was placed in the cell of respondent Perkins, who was incarcerated on charges unrelated to the subject of the agent's investigation. [Perkins] made statements that implicated him in the crime that the agent sought to solve. [Perkins] claims that the statements should be inadmissible because he had not been given *Miranda* warnings by the agent. We hold that the statements are admissible. *Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." (*Ibid.*)

The *Perkins* court emphasized that its holding was rooted in the notion that the coercive pressures that *Miranda* is designed to protect against are absent when a suspect is speaking to a person whom he does not know to be a government agent:

> "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. [Citations.] When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking. *Miranda,* 384 U.S., at 449 (The "principal psychological factor contributing to a successful interrogation is *privacy*—being alone with the person under interrogation" '); *id.,* at 445. There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should [h]e confess.
>
> "It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official

17

interrogation. We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent. Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist. The state court here mistakenly assumed that because the suspect was in custody, no undercover questioning could take place. When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners. 'When the agent carries neither badge nor gun and wears not "police blue," but the same prison gray' as the suspect, there is no '*interplay* between police interrogation and police custody.' [Citation.]" (*Perkins, supra*, 496 U.S. at pp. 296–297.)

The *Perkins* court also emphasized that "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Perkins, supra*, 496 U.S. at p. 297; see *ibid.* ["Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns"].)

The California Supreme Court has repeatedly applied *Perkins* in upholding the admissibility of statements made by a defendant to a person whom the defendant does not suspect to be a government agent. (See, e.g., *People v. Fayed* (2020) 9 Cal.5th 147, 165 (*Fayed*); *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 284 [stating that although defendant "misplaced his trust in confiding in [an inmate acting as government agent], [defendant's] tape-recorded statements were voluntary and free of compulsion" and noting that "the United States Supreme Court has rejected

18

' "the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent" ' "]; *People v. Tate* (2010) 49 Cal.4th 635, 686 (*Tate*) ["Both 'custody' and 'police questioning' are necessary to invoke *Miranda,* and both concepts are viewed from the suspect's perspective"].)[17]

In addition, in *People v. Mayfield* (1997) 14 Cal.4th 668 (*Mayfield*), the California Supreme Court considered whether a defendant's surreptitiously recorded statements made to his father were obtained in violation of *Miranda* when those statements were made *after* the defendant had been "advised . . . of his rights per *Miranda,*" and the defendant had "declined to waive his rights and [had] requested an attorney." (*Id.* at p. 757.) The *Mayfield* court concluded that the statements were *not* obtained in violation of *Miranda* for two reasons:

> "First, as the United States Supreme Court has explained, '[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda.*' ([*Perkins, supra,* 496 U.S. at p. 296]; see also *People v. Webb* (1993) 6 Cal.4th 494, 525–526.) Second, [defendant's father] was not a police agent sent to elicit incriminating information from defendant." (*Id.* at p. 758.)

In *Tate, supra,* 49 Cal.4th 635, the California Supreme Court noted that in *Mayfield,* it rejected a defendant's claim that statements made to his father were obtained in violation of *Miranda* in a case in which the defendant

---

[17]    In a case predating *Perkins,* but employing similar reasoning, the California Supreme Court stated, "*Miranda, supra,* 384 U.S. 436, has never been applied to conversations between an inmate and an undercover agent." (*People v. Williams* (1988) 44 Cal.3d 1127, 1141–1142.)

had invoked "his right to silence."[18] (*Tate, supra,* at p. 685.) The *Tate* court noted:

> "We held in *Mayfield* that the police did not violate *Miranda* when, after the defendant in custody *had invoked* his right to silence, and thus could not be further interrogated, they allowed his father to discuss the case privately with him, then extracted a report of what was said. We so concluded because ' "defendant's conversations with his own visitors are not the constitutional equivalent of [forbidden] police interrogation." [Citations.]' (*Mayfield, supra,* 14 Cal.4th 668, 758; see also *Arizona v. Mauro* (1987) 481 U.S. 520, 528 [police did not engage in forbidden interrogation, for purposes of *Miranda,* by mere placement of officer in room to observe and tape-record conversation between suspect in custody, who had invoked right to silence, and suspect's wife].)[19] This conclusion is entirely consistent with *Perkins, supra,* 496 U.S. 292; one who voluntarily speaks alone to a friend, even during a break in a custodial interrogation, has no reason to assume, during the private conversation, that he or she is subject to the coercive influences of *police* questioning." (*Id.* at pp. 685–686.)

In addition, California Court of Appeal cases "have uniformly come to the conclusion that *Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 815 (*Orozco*);

---

18    In *Mayfield*, the defendant had invoked *both* his right to remain silent *and* his right to an attorney. (*Mayfield, supra,* 14 Cal.4th at p. 757.)

19    In a footnote here, the *Tate* court stated, "The above quoted statement in *Mayfield* stands on its own merits, though we added, as makeweight, the observation that, in that case, the meeting between father and suspect was entirely on their initiative, not that of the police. (*Mayfield, supra,* 14 Cal.4th at p. 758.)" (*Tate, supra,* 49 Cal.4th at p. 686, fn. 27.)

citing *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1540–1541 (*Guilmette*); *People v. Plyler* (1993) 18 Cal.App.4th 535, 544–545.)

In a comprehensive opinion, the *Orozco* court rejected the defendant's argument that admission of such statements violates *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*), which holds that a suspect's invocation of his *Miranda* right to counsel precludes "further police-initiated custodial interrogation" unless and until counsel is present or the suspect "initiates further communication" with the police. (*Edwards, supra*, at pp. 484–485.) The *Orozco* court reasoned that "there is no 'interrogation' when a suspect speaks with someone he does not know is an agent of the police," and "[b]ecause there is no 'interrogation' in these circumstances, there is also no basis to apply *Edwards*'s restrictions on further 'interrogation." (*Orozco, supra*, 32 Cal.App.5th at p. 814.)

The *Orozco* court also explained that admitting statements made by a suspect to a person the suspect does not know is an agent of the police is consistent with the rationale underlying *Miranda,* even when those statements are made *after* the suspect has invoked his *Miranda* rights:

> "*Miranda*'s rule requiring a warning, a waiver and the cessation of questioning if a suspect invokes his *Miranda* rights is designed to dispel the 'compelling' 'psychological' 'pressures' that are part and parcel of 'in-custody interrogation.' (*Miranda, supra*, 384 U.S. at pp. [448–449, 461, 467].) *Edwards*'s rule is based on those same pressures . . . . This makes sense: *Edwards* implements *Miranda,* so should be limited to the evil *Miranda* was created to combat.
>
> "Because '[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone' that he thinks is a lover, a family member, a friend or even a fellow criminal [citations], *Miranda*'s (and, by extension,

*Edwards*'s) purpose in combating that atmosphere and compulsion is simply not implicated in such situations. To apply *Edwards* here is to require police to provide counsel while a suspect is speaking with a lover, family member or friend in what he (mistakenly) thought was a private conversation. This would undoubtedly discourage suspects from speaking to anyone and thus effectively convert *Edwards* into a rule automatically excluding all postinvocation statements, a result that *Edwards* itself acknowledged swept far beyond *Miranda*'s reach." (*Orozco, supra*, 32 Cal.App.5th at pp. 814–815.)

ii. *Application*

Martinez argues that his "*Miranda* rights were violated" when agents of the police, i.e., the undercover detective and the cooperating individual, deliberately elicited incriminating remarks from him after he had invoked his right to counsel under *Miranda*. We disagree. As the *Orozco* court persuasively explained, in the absence of a suspect's *knowledge* that he is speaking with an agent of police, a suspect is not subjected to an interrogation within the meaning of *Miranda* and *Edwards*. (See *Orozco, supra*, 32 Cal.App.5th at p. 814 [citing case law in support of the proposition that "there is no 'interrogation' when a suspect speaks with someone he does not know is an agent of the police"].) Thus, *Edwards*'s bar on further interrogation after a suspect invokes his right to counsel is not triggered by attempts by a person who is not known by the suspect to be an agent of the police to elicit incriminating statements from the suspect. (See *ibid*.)

We are not persuaded by Martinez's reliance on a footnote in Justice Brennan's concurring opinion in *Perkins* in which Justice Brennan stated, "Nothing in the Court's opinion suggests that, had [the defendant] previously invoked his Fifth Amendment right to counsel or right to silence, his statements would be admissible. If [defendant] had invoked either right, the

22

inquiry would focus on whether he subsequently waived the particular right."
(*Perkins, supra,* 496 U.S. at pp. 300–301, fn.* (conc. opn., Brennan, J.).)  As
the *Orozco* court explained in rejecting Justice Brennan's reasoning, "Justice
Brennan . . . makes no attempt to reconcile *Edwards*'s limitation to
postinvocation 'interrogations' with his concession elsewhere in his
concurrence that the 'questioning' of Perkins in that case 'does not amount to
"interrogation." ' (*Perkins,* at p. 300.)" (*Orozco, supra,* 32 Cal.App.5th at
p. 815.)[20]  Therefore, we do not agree with Justice Brennan's reasoning that,
after invocation, absent a waiver, a defendant's statements made during a
*Perkins* operation are inadmissible.  As the *Guilmette* court explained in
rejecting a defendant's argument that "his prior invocation of rights . . .
somehow convert[ed] an unprotected conversation into a protected one under
*Miranda*" (*Guilmette, supra,* 1 Cal.App.4th at pp. 1540–1541):

> "The 'interrogation' prohibited by *Edwards* means
> 'custodial interrogation.'  'Absent "custodial interrogation,"
> *Miranda* simply does not come into play. [Citations.] . . . .
> Hence, if "custodial interrogation" is lacking, *Miranda*
> rights are not implicated and there is consequently "no
> occasion to determine whether there ha[s] been a valid
> waiver." (*Edwards, supra,* at p. 486.])'  *People* v. *Mickey*
> (1991) 54 Cal.3d 612, 648.  *Edwards,* therefore, does not
> prohibit all questioning by police but rather questioning
> that constitutes under *Miranda* 'custodial interrogation.' "
> (*Id.* at p. 1541.)

Further, while Martinez states that "neither the United States
Supreme Court nor the California Supreme Court has addressed the

---

[20]  The *Orozco* court also noted that "*Perkins* had a seven-justice
majority . . . so [Justice] Brennan's concurrence was not the critical fifth
vote," and as a consequence it is clear that his concurrence does not
constitute binding precedent.  (See, e.g., *Maryland v. Wilson* (1997) 519 U.S.
408, 412–413.)

application of *Miranda* in a case where – as here – the defendant has invoked his or her *Miranda* rights prior to the *Perkins* interview,"[21] we see nothing in either *Perkins* or in the California Supreme Court case law described above that would provide support for Martinez's argument. On the contrary, as the *Orozco* court explained, the rationale of *Miranda* as well as its application in both *Edwards* and *Perkins* supports the conclusion that a suspect's invocation of his *Miranda* rights does *not* preclude the admission of statements that a suspect later makes to a person he does not know is an agent of the police. (See *Orozco, supra*, 32 Cal.App.5th at p. 814–815.) That is because *Miranda*'s purpose of guarding against the coercive pressures of in custody *interrogations* would not be served by suppressing statements made in the absence of such pressures, and such pressures are not present when a suspect speaks to a person he does know is an agent of the police. As the *Mayfield* court observed in quoting *Perkins*, " '[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*,' " (*Mayfield, supra*, 14 Cal.4th at p. 758, quoting *Perkins, supra*, 496 U.S. at p. 296) and that is true irrespective of whether the suspect has previously invoked his *Miranda* rights.

---

[21]     In support of his point, Martinez cites to Justice Liu's statement dissenting from the denial of review in *People v. Valencia* (Dec. 11, 2019, S258038) (statement by Liu, J. dissenting from denial of review). In his statement, Justice Liu acknowledges that "our courts of appeal have extended *Perkins* to hold that surreptitious questioning of a suspect is permissible even *after* the suspect has invoked *Miranda* rights and remains in custody." (*Valencia, supra*, S258038 (statement by Liu, J. dissenting from denial of review), second italics added.) Justice Liu indicated in his statement that he would grant review in order to consider the validity of this case law. (*Ibid.*)

Accordingly, we conclude that the trial court's admission of Martinez's statements made during the *Perkins* operation did not violate his fifth amendment right against compulsory self-incrimination.

### d. *The trial court's admission of Martinez's statements did not violate his fourteenth amendment right to due process*

Martinez also contends that admission of the statements violated his fourteenth amendment right to due process because they were "involuntarily made."

### i. *Governing law*

"State and federal constitutional principles prohibit a conviction based on an involuntary confession. [Citations.] 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, " '[t]he question is whether defendant's choice to confess was not "essentially free" because his [or her] will was overborne.' " [Citation.]' [Citation.] . . . [¶] A confession's voluntariness depends upon the totality of the circumstances in which it was made." (*Winbush, supra*, 2 Cal.5th at p. 452.)

"A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.]" (*McWhorter, supra*, 47 Cal.4th at p. 347.)

While it is possible that a person surreptitiously working as an agent of the government might engage in coercive threats that vitiate the voluntariness of a confession (see *Arizona v. Fulminante* (1991) 499 U.S. 279, 287 [coercion due to "credible threat of physical violence" if defendant did not confess]), a person secretly acting as a government agent does not engage in coercive or improper tactics merely by "coax[ing] and prodd[ing]," a defendant

25

to speak.  (*Fayed, supra*, 9 Cal.5th at p. 166.)  It is only when the agent uses improper tactics that overcome a defendant's will that it may be said that a defendant's confession is involuntary.  (*Id* at pp. 165–166 [stating that although informant was "much more than a passive listener," confession was voluntary since "defendant was neither compelled into revealing his role in [victim's] murder, nor was he coerced into hiring a hitman to kill [second victim]"].)

ii.  *Application*

Martinez does not point to any threats or promises of leniency made by the cooperating individual or the undercover detective that could have overcome Martinez's will and led to his confession, and our review of the video and transcript of the *Perkins* operation reveals none.  Instead Martinez suggests that the "hierarchy of those present in the locked jail cell," resulted in pressures that overcame his will.  He argues:

> "As a young gang member and, by his own admission, new to the prison system [citation], appellant could not remain silent when questioned about details of the shooting because there are consequences to disrespecting an older gang member.  [Citation]  He was a younger inexperienced Hispanic gang member and he would have clearly felt psychological and physical pressure to 'fall in line' and respond to any questions from this physically impos[ ]ing, older, and heavily-tattooed shotcaller."

Without disregarding the possible implicit pressure to respond respectfully to an "older gang member," we conclude that Martinez points to nothing amounting to an implied threat that would have led to his confession.  Further, having independently viewed the video and audio recording of the *Perkins* operation, we agree with the trial court's observations as to the tenor of the participants' conversation:

"Listening to the conversation, again, I just didn't pick up anything that was remotely a threat. The defendant's tone, his interaction seemed to be very voluntary, very engaged in the conversation. They were joking in the conversations, as well."

Martinez's argument that suppression of his statements is supported by the fact "[t]here was nothing spontaneous about appellant's eventual confession," is not persuasive. There was nothing improper about the cooperating individual or the undercover detective encouraging Martinez to speak about the murder. (See *Fayed, supra*, 9 Cal.5th at p.166.) Further, a review of the entirety of the jailhouse conversation supports the conclusion that Martinez spoke with the cooperating individual and the undercover detective about the murder in order to solicit advice about his own legal difficulties from purportedly experienced criminals. (See *ibid.* ["If the ' "decision [to speak] is a product of the suspect's own balancing of competing considerations, the confession is voluntary" ' "].)

Further, while it can certainly be said that the cooperating individual established a rapport with Martinez by, as the trial court colorfully described, "[providing] a dissertation . . .to the defendant about jailhouse politics," and the cooperating individual effectively used this rapport to, as the People acknowledge "deceive[ ]," Martinez into talking about the murder, " '[t]he use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement.' " (*Fayed, supra*, 9 Cal.5th at p. 165.) Critically, Martinez points to nothing in the record that demonstrates that any of the statements made by the cooperating individual or the undercover officer were of the type likely to produce an untrue statement.

27

Accordingly, we conclude that the trial court's admission of Martinez's statements did not violate his fourteenth amendment right to due process.

2. *We accept the People's concession that there is insufficient evidence to support the gang enhancement finding and the gang / firearm enhancement finding in light of a change in the law, and that the matter must be remanded to allow the People the option to retry these enhancement allegations*

In a supplemental letter brief, Martinez claims that the true findings on the gang enhancement (§ 186.22, subd. (b)(1)) and the related firearm / gang enhancement (§ 12022.53, subds. (d) and (e)(l)) must be reversed due to the enactment of substantive amendments to the gang statutes in A.B. 333.

Section 186.22, subdivision (b)(1) generally provides for a sentencing enhancement for any "person who is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members."  In addition, proof of a firearm / gang enhancement allegation under section 12022.53, subdivisions (d) and (e)(l) requires demonstration that the defendant violated section 186.22, subdivision (b). (See § 12022.53, subd. (e)(1)(A).)[22]

Martinez claims that the new law made three significant changes to section 186.22: " 'it amended the definitions of "criminal street gang" and "a

---

[22]  Specifically, section 12022.53, subdivision (e)(1) provides:

> "(e)(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:
>
> (A) *The person violated subdivision (b) of Section 186.22.*
>
> (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."  (Italics added.)

28

pattern of criminal gang activity," and clarified the evidence needed to establish an offense benefits, promotes, furthers or assists a criminal street gang.' " (Quoting *People v. E.H.* (2022) 75 Cal.App.5th 467, 477; citing *People v. Lopez* (2021) 73 Cal.App.5th 327, 344.) He further argues that the new law applies retroactively under *In re Estrada* (1965) 63 Cal.2d 740, 746 and its progeny.

Martinez also contends that the evidence presented at trial to establish the gang enhancement true finding (§ 186.22, subd. (b)(1)) and the related firearm / gang enhancement true finding (§ 12022.53, subds. (d) and (e)(l)) is insufficient under section 186.22 as amended by the new law and that the "two enhancements must . . . be reversed." Specifically, Martinez argues that the "jury . . . was not instructed to make any . . findings" regarding how the charged offenses or the predicate gang offenses "commonly benefit," the gang, as is required under the new law. Martinez also argues that the jury did not make "any findings under [A.B. 333's] newly revised definition," of "pattern or criminal gang activity." In light of these insufficiencies, Martinez maintains that the proper remedy is to remand and afford the prosecution the opportunity to retry the affected enhancement allegations.

In their supplemental brief, the People forthrightly concede that reversal of the gang enhancement true finding and the related firearm / gang enhancement true finding, and a remand for a possible retrial of the allegations underlying these findings, is required due to A.B. 333. The People state:

> "[The People] respectfully request[ ] that the gang enhancement and principal use of a firearm enhancement [i.e., the firearm / gang enhancement] be reversed and remanded with directions to allow the prosecution an opportunity to retry those enhancements under AB 333's requirements."

We accept the People's concession. Accordingly, we reverse the jury's true findings on the gang enhancement allegation (§ 186.22, subd. (b)(1)) and the firearm / gang enhancement allegation (§ 12022.53, subds. (d) and (e)(l)) in light of A.B. 333 and remand the matter to permit the People to retry these allegations if they so choose.[23]

### 3. *The record does not demonstrate that any of J.M.'s school records were withheld from defense counsel*

Martinez requests that this court review J.M.'s sealed school records to determine whether the defense was provided with all of the documents to which he was entitled. As we explain, the record on appeal does not demonstrate that any of J.M.'s school records were withheld from defense counsel.

### a. *Factual and procedural background*

#### i. *Martinez's motion to compel the release of J.M.'s school records*

Prior to trial, Martinez filed a motion to compel the release of J.M.'s school records, arguing that the records "potentially contain exculpatory evidence." Together with his motion, defense counsel filed a declaration in support of the release of the records. In his declaration, defense counsel

---

[23] As noted in part I, *ante*, in addition to rendering a true finding on the firearm / gang enhancement allegation, the jury also found true that Martinez "intentionally and personally discharged a firearm and proximately caused great bodily injury and death to a person, within the meaning of section 12022.53, subdivision (d)," and the trial court sentenced Martinez to a term of 25 years to life for the personal use firearm enhancement (§ 12022.53, subd. (d)) to be served consecutively to the sentence for the murder. As the People correctly note in their supplemental brief, "the firearm discharge enhancement under section 12022.53, subdivision (d) remains intact." Martinez makes no argument to the contrary.

stated "it is clear that [J.M.] enjoys fighting and he has employed weapons in the past when engaged in fights, as well as his DNA is found on the firearm employed in the instant case . . . ."

ii. *The initial hearing on Martinez's motion*

On July 3, 2019, the trial court held a hearing at which counsel and the court discussed J.M.'s motion. The prosecutor stated:

> "My objection to the records is simply that I don't think that they should be released in their entirety given the fact that this is a juvenile, 14 years old. I do think it's appropriate for the Court to review them *in camera* for specific and very narrow purposes."

The trial court then confirmed with the prosecutor that it was the court's understanding that there had been previous requests for J.M.'s records from the "juvenile system" and that records produced in response to these requests had been released to the defense. The court noted that there was "some indication of prior violence and fighting with those records that were disclosed to [defense counsel], which indicate some of that may have occurred in school."

Shortly thereafter, the court asked defense counsel, "What is it that you're requesting the Court review the records for?"

Defense counsel responded: "Crimes of violence; crimes of threats; use of weapons -- any weapons: Firearms, knives, shanks, pencils; issues of credibility; gang documentation; statements of gang involvement."

The trial court indicated that it would conduct "an *in camera* review of the records for threats, violence, weapons, credibility, and gang involvement."

iii. *The July 8, 2019 hearing on Martinez's motion*

The trial court held a second hearing on Martinez's motion on July 8, 2019. At the hearing, the following colloquy occurred:

31

"The court: All right.  Thank you.  And we are here today because the Court has had an opportunity to review the previously mentioned [subpoenaed] records for the areas sought.  I have done so.  I have a copy of those to be turned over to [defense counsel].  *Included in that, the return of the [subpoenas], there was an explanation of some records that weren't provided and why.*

"[Defense counsel]: Okay.

"The court: I just made a photocopy of that.  I'm going to give that to you as well so you have that.

"[Defense counsel]: Thank you.

"The court: You did provide a protective order.  I have read and reviewed the protective order.  I have signed that. *I have also sealed a copy of the records that are being turned over to [defense counsel] so it's preserved for the record for any reviewing court.*"

A minute order from this hearing states:

"The Court addresses counsel regarding the subpoenaed records to be turned over to [defense counsel.  The Court notes that [defense counsel] has provided a protective order which the court signs.  At the direction of the Court, the clerk hands the records to [defense counsel]."

### iv.  *Martinez's claim on appeal*

In his opening brief, Martinez states the following:

"Following the [trial] court's review of the subpoenaed school records, the court ruled that it was releasing a copy of the discoverable records to the defense along with an explanation why other certain records were not included.  A sealed copy of those records and the court's explanation was ordered retained in the court file.(1RT 123)  Neither the reporter's transcript nor the resulting minute order reflect[s] the basis for the court's ruling."

32

Martinez requested the following:

> "[Martinez] requests this court conduct an independent review of J.M.'s school records and, if it determines there were records that should have been released, it should conditionally reverse the judgment and remand with directions to give appellant the opportunity to demonstrate prejudice."

v. *This court's order directing Martinez to file an application requesting that the trial court transmit the sealed records that he wanted this court to review*

While Martinez's appeal was pending, this court issued an order that states in relevant part:

> "In [Martinez's] opening brief, [Martinez] makes reference to a number of sealed documents and asks this court to review the sealed documents . . . . [Citation.] None of the sealed documents have been transmitted to this court. . . . [Martinez's] counsel is directed to file an application in the trial court requesting that the trial court transmit whatever sealed records [Martinez] wishes this court to review."

vi. *Martinez's request for transmittal of sealed records*

In response to our order, Martinez filed an application in the trial court requesting that court transmit the following sealed records:

> "July 8, 2019: Middle school records from Vista Unified School District of the minor, [J.M.] examined in camera by the Honorable Robert J. Kearney (Dept. 20) and ordered sealed." (Italics omitted.)

vii. *This court's order augmenting the record with the sealed records and the trial court's transmittal of the records*

This court later entered an order augmenting the record with the requested sealed records, and the trial court transmitted the records under seal to this court.

b. *Application*

While Martinez suggests in his brief that the trial court *withheld* the disclosure of some of J.M.'s school records and ordered *those* records sealed, during the July 8, 2019 hearing, the trial court stated that it was maintaining a sealed copy of the records that the court was *providing* to the defense. As noted in part III.A.3.a.iii, *ante*, the court stated, "I have also sealed a copy of the records *that are being turned over to [defense counsel]* so it's preserved for the record for any reviewing court." (Italics added.) In addition, the minute order from the July 8 hearing states, "the clerk hands the records to [defense counsel];" the order does *not* state that *any* records were withheld.

It appears that the basis of Martinez's claim that the trial court withheld some of J.M.'s records may have stemmed from the trial court's statement, "Included in that, the return of the [subpoenas], there was an explanation of some records that weren't provided and why." However, it does not appear that the "explanation" referred to by the court was a statement from the *trial court*. Rather, the trial court was likely referring to a statement in the sealed records from the custodian of the school records explaining why certain records were not available.

However, there is nothing in the sealed records transmitted to this court that indicates that the *trial court* withheld certain of J.M.'s school

34

records.  Nor is there any ruling from the trial court stating that it was withholding disclosure of some of J.M.'s school records.

Accordingly, we conclude that Martinez is not entitled to a conditional reversal on the ground that certain of J.M.'s school records were improperly withheld from the defense.[24]

4. *The trial court did not abuse its discretion in denying Martinez's motion to disclose the identity of the cooperating individual who assisted with the* Perkins *operation*

Martinez asks this court to determine whether the trial court abused its discretion in denying his motion to disclose the identity of the cooperating individual who assisted with the *Perkins* operation.  Martinez does not present any specific claim in support of reversal.  However, he requests that this court review the sealed transcript of an in camera hearing and two sealed declarations filed by the prosecutor for the purpose of determining whether the trial court abused its discretion in denying Martinez's motion to disclose the identity of the cooperating individual.

---

[24]   In the unlikely event that the trial court *did* withhold some of J.M.'s school records and *did* provide a ruling explaining its reasons for the withholding of such records, Martinez has failed to provide an adequate record to permit this court to review the propriety of such actions.  As noted in the text, *ante*, the record does not indicate that any records were withheld from the defense and does not contain a ruling explaining the basis for any such withholding.  Thus, Martinez has not demonstrated any basis for reversal.  (See *People v. Whalen* (2013) 56 Cal.4th 1, 85 ["Because defendant has not supplied a record adequate to review this claim, it fails"].)

a. *Governing law and standard of review*

　　i. *A prosecutor's general discovery obligations and section 1054.7's good cause exception*

Section 1054.1 generally requires the prosecution to disclose to the defendant "exculpatory evidence," (*id.* at subd. (e)) that it possesses. "[S]ection 1054.7 provides that the court may deny discovery for 'good cause,' including possible danger to a witness or compromise to other investigations." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1054.)

" 'We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard.' [Citations.]  The proper exercise of a trial court's discretion under section 1054.7 does not violate a criminal defendant's confrontation or due process rights." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1105.)

　　ii. *The law pertaining to the disclosure of an informant's identity*

In *Davis v. Superior Court* (2010) 186 Cal.App.4th 1272 (*Davis*), the Court of Appeal outlined a public entity's privilege to not disclose the identity of an informant in a criminal case, as follows:

> "Under Evidence Code section 1041, subdivision (a), a public entity has a privilege to refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of a law.  The prosecution, however, 'must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant.  [Citation.]'  [Citation.] 'An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant,' on which issue the defendant has the burden of producing 'some' evidence.  [Citations.]  The defendant must show that the informant was in a position

36

to perceive ' "the commission or the immediate antecedents of the alleged crime." ' [Citation.]" (*Id.* at pp. 1276–1277.)

A trial court's ruling concerning the disclosure of the identity of an informant is reviewed for an abuse of discretion. (*Davis, supra,* 186 Cal.App.4th at pp. 1272, 1277.)

b. *Factual and procedural background*

i. *Martinez's motion in limine to disclose the cooperating individual's identity*

Prior to trial, Martinez filed a motion in limine to compel the disclosure of the cooperating individual's identity. Martinez contended that disclosure of the cooperating individual's identity was necessary so that the cooperating individual could be examined about "questions asked and the statements made" during the *Perkins* operation. The defense also argued that disclosure of the cooperating individual's identity was necessary because the cooperating individual was allegedly a material witness who could potentially provide evidence that might exonerate Martinez.

ii. *The People's opposition to the motion to compel*

The People filed an opposition to the motion to compel. In their opposition, the People noted that they had "no intention of calling the [cooperating individual] [at] trial."[25] The People argued that they were not required to disclose the cooperating individual's identity pursuant to Evidence Code section 1041, subdivision (a). The People also disputed the defense's claim that the cooperating individual was a material witness, arguing in part:

> "In this case, the [cooperating individual] was not a co-participant in the crime nor was he a witness to the crime.

---

[25] It is undisputed that the cooperating individual did not testify at Martinez's trial.

> His entire involvement [was] comprised of sitting in a cell and talking to [Martinez]. He cannot provide any information that might exonerate [Martinez] any more than he can provide information as to his guilt apart from what is contained in the admissible recording already disclosed to [d]efense."

The People also argued that there was good cause for denying disclosure of the cooperating individual's identity under section 1054.7. In support of this contention, the People argued that there "would be an extreme danger to the [cooperating individual's] life if his identity was revealed," and "revealing his identity would compromise . . . future investigations by law enforcement." The People also requested that the trial court hold an in camera hearing so that they could provide additional information concerning the cooperating individual's efforts in assisting law enforcement in other cases.

The People filed two declarations under seal in support of their opposition.

### iii. *Martinez's addendum*

Martinez filed an "addendum," to his motion to compel in which he argued that, due to poor audio quality of the recording of the *Perkins* operation, there remained "significant disagreements," as to what was said during the operation. Martinez argued that it was necessary for the trial court to order the cooperating individual's identity to be disclosed so that the defense could examine him as to statements that were made during the *Perkins* operation.

### iv. *The hearing on the motion in limine*

The trial court held a hearing on the defense's motion. At the hearing, the court stated, "I think regardless of what the court ultimately decides, I think an in camera [hearing] is probably appropriate." After discussions with

the prosecutor and the defense, the court stated that it would hold an in camera hearing first, and then consider the motion.

v. *The in camera hearing*

The trial court held an in camera hearing on the motion at which the prosecutor, the court, two detectives, and the cooperating individual were present. The trial court ordered that the transcript of the hearing be sealed.

vi. *The trial court's ruling denying the motion*

Following the hearing, the trial court heard argument from the defense and the prosecutor. The court then denied the motion. The court reasoned that the defense had not demonstrated that the cooperating individual could potentially provide exculpatory information. The court reasoned in part:

> "[T]he [cooperating individual] was not a percipient witness of the actual alleged crime. He did not know [Martinez] prior to this particular date. Everything that was said or done between them was either video and/or audiotaped or both, actually."

The court also reasoned:

> "I do find there would be a possible danger to the safety of the witness if his identity was disclosed. In addition, it would compromise future investigations.
>
> "So even if there was some exculpatory portion, which I do not see in listening to the tape[26] and in reading the papers, in balancing it, I think the People would have good cause to deny the disclosure of the nontestifying witness."

---

26    The court was referring to the recording of the *Perkins* operation.

c. *Application*

As noted *ante*, Martinez does not present any specific argument for reversal. Rather, analogizing to case law governing review of *Pitchess*[27] motions pertaining to confidential law enforcement personnel records, Martinez asks this court to conduct "an independent review of the sealed records," to determine whether the trial court abused its discretion in denying his motion to compel the disclosure of the cooperating individual's identity.

We have conducted an independent review of the sealed records pertaining to Martinez's motion. Based on our review of both the sealed records and the public filings, the trial court could have reasonably determined that the cooperating individual was not a "material witness" because there was not " 'a reasonable possibility that [the cooperating individual] . . . could give evidence on the issue of guilt that might exonerate the defendant.' " (*Davis, supra*, 186 Cal.App.4th at p. 1276.) The trial court also reasonably determined that "there would be a possible danger to the safety of the witness if his identity was disclosed," and that such disclosure "would compromise future investigations." We therefore conclude that there was "good cause" to deny the defense's motion pursuant to section 1054.7.

Accordingly, we conclude that the trial court did not abuse its discretion in denying Martinez's motion to compel disclosure of the identity of the cooperating individual.

---

[27]     (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531.)

40

5. *The judgment must be corrected to award the proper amount of custody credits*

Martinez claims that he is entitled to an award of 388 days of presentence custody credits and that the trial court erroneously awarded him only 338 days of custody credits.[28]

The People concede the error.

We accept the People's concession and determine that at the conclusion of the resentencing mandated in part III.B.4, *post*, the trial court shall ensure that the judgment states the proper amount of custody credits.

6. *The abstract of judgment shall be corrected to reflect that Martinez is to pay restitution to the Victim Compensation Board*

Martinez notes that the trial court ordered him to pay, jointly and severally with J.M., $7,500 in restitution to the Victim Compensation Board.[29] However, the abstract of judgment indicates that the $7,500 should be paid directly to Ruiz's family. Martinez requests that we direct the trial court to correct the abstract of judgment to reflect the trial court's order.

The People concede the error and agree that "the court ordered that Martinez, along with [J.M.], was to pay $7,500 in restitution to the [Victim Compensation Board], and the abstract of judgment must be corrected to reflect that order."

---

28    The probation report recommended that the trial court award Martinez *388* days of custody credit. However, at sentencing, the trial court stated, "You will receive credits of *338* actual days, zero good time credits, for a total of *330* days credit." (Italics added.) The clerk's minutes and abstract of judgment state that Martinez was awarded 338 days.

29    The probation report indicates that the restitution was related to funeral and burial costs paid by the Victim Compensation Board.

41

We accept the People's concession. At the conclusion of the resentencing mandated in part III.B.4, *post*, the trial court is directed to correct the abstract of judgment to reflect the trial court's order that restitution be paid to the Victim Compensation Board.

B. *The People's appeal*

In their cross-appeal, the People contend that the trial court erred when it determined that Martinez's juvenile adjudication for assault with a deadly weapon (§ 245, subd. (a)(1)) is not a qualifying prior strike offense.[30]

The People contend that Martinez is estopped from arguing that his prior juvenile adjudication is not a strike offense because, in the prior juvenile proceeding, Martinez entered into a plea agreement in which he agreed that his adjudication for assault with a deadly weapon (§ 245, subd. (a)(1)) constituted a strike. For the reasons discussed *post*, we agree.[31]

1. *Standard of review*

In *People v. Miller* (2012) 202 Cal.App.4th 1450 (*Miller*), the Court of Appeal explained that the de novo standard of review applies to a determination of whether a defendant is estopped from challenging the

---

[30] The People's appeal is authorized. (See *People v. Trujillo* (2006) 40 Cal.4th 165, 173 ["the People . . . may appeal the imposition of the sentence in order to challenge the trial court's ruling that defendant's prior conviction . . . is not a strike"].)

[31] The People also argue that Martinez's prior juvenile adjudication for assault with a deadly weapon (§ 245, subd. (a)(1)) is a strike offense (§ 667, (d)(3) [listing requirements for a juvenile adjudication to constitute a strike]) because it constituted a Welfare and Institutions Code section 707, subdivision (b) offense under the reasoning of *In re Pedro C.* (1989) 215 Cal.App.3d. 174 (*In re Pedro C.*). We need not, and do not, consider this argument in light of our reversal for the reasons stated in the text.

nature of a prior conviction where the facts are undisputed. The *Miller* court stated:

> "[The People] concede[ ] that the plea agreement erroneously stated that diazepam possession was a felony and that appellant's plea to the same was in error. [The People], however, assert[ ] that appellant is estopped from modifying his conviction . . . . The facts are not in dispute and we review the application of the estoppel doctrine de novo, as a question of law. [Citation.] As noted above, we conclude that for reasons of public policy, appellant is estopped from asserting his claim of error to vacate and modify his conviction." (*Id.* at pp. 1445–1456.)

In this case, as in *Miller*, the relevant facts are undisputed and the question of the application of the doctrine of estoppel is one of law subject to de novo review.[32]

### 2. *Governing law*

#### a. *The law governing juvenile adjudications as strikes*

In *People v. Garcia* (1999) 21 Cal.4th 1 (*Garcia*), the Supreme Court discussed the circumstances under which a juvenile adjudication may qualify

---

[32] While the People argued in the trial court that Martinez admitted during the plea hearing of the prior juvenile proceeding that his juvenile adjudication for a violation of 245, subdivision (a)(1) constituted a strike, the People did not distinctly raise an estoppel argument.

We exercise our discretion to consider the People's estoppel argument on appeal notwithstanding any possible forfeiture. (See *People v. Williams* (1998) 17 Cal.4th 148, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party"].) While the *Williams* court explained that an appellate court lacks discretion to review unpreserved claims pertaining to "the admission . . . or exclusion . . . of evidence," that is not the case here. (*Ibid.*) We exercise our discretion because the People's argument presents a pure question of law and Martinez presents no forfeiture argument on appeal and responds in his briefing to the People's argument on the merits.

as a strike under the Three Strikes law.  The *Garcia* court noted that a provision of the Three Strikes law, section 667, subdivision (d)(3),[33] provides as follows with respect to determining whether a prior juvenile adjudication constitutes a strike:

> " 'A prior juvenile adjudication shall constitute a prior felony conviction for purposes of sentence enhancement if:
>
> " '(A) The juvenile was 16 years of age or older at the time he or she committed the prior offense.
>
> " '(B) The prior offense is listed in subdivision (b) of Section 707 of the Welfare and Institutions Code or described in paragraph (1) [subdivision (d)(1) of section 667] or (2) [subdivision (d)(2) of section 667] as a felony.[[34]]
>
> " '(C) The juvenile was found to be a fit and proper subject to be dealt with under the juvenile court law.
>
> " '(D) The juvenile was adjudged a ward of the juvenile court within the meaning of Section 602 of the Welfare and Institutions Code because the person committed an offense listed in subdivision (b) of Section 707 of the Welfare and Institutions Code.' " (*Garcia, supra*, 21 Cal.4th at pp. 4–5.)

---

[33]     The *Garcia* court noted that "[s]ubdivision (b)(3) of section 1170.12 is virtually identical," and added, "[o]ur discussion applies to it as well." (*Garcia, supra*, 21 Cal.4th at p. 830, fn. 3.)

[34]     In a footnote, the *Garcia* court noted:

> "Subdivision (d)(1) of section 667 covers '[a]ny offense defined in subdivision (c) of Section 667.5 as a violent felony or any offense defined in subdivision (c) of Section 1192.7 as a serious felony in this state.'  Subdivision (d)(2) provides that '[a] prior conviction of a particular felony shall include a conviction in another jurisdiction for an offense that includes all of the elements of the particular felony as defined' as a 'violent' or 'serious' felony in this state." (*Garcia, supra*, 21 Cal.4th at p. 4, fn. 4.)

The *Garcia* court explained further:

> "Because the two sets of offenses referenced in paragraph (B) (Welfare and Institutions Code section 707[, subdivision] (b) offenses, and 'serious' or 'violent' offenses) are not identical, section 667, subdivision (d)(3) would contain an internal conflict if the lists in paragraphs (B)[35] and (D) were both understood as defining the set of juvenile offenses qualifying as strikes. Under paragraph (B) a given juvenile offense would qualify if it were listed in [Welfare and Institutions Code section 707, subdivision (b)] *or* if it were serious or violent; under paragraph (D), however, an offense would qualify *only* if it were listed in [Welfare and Institutions Code section 707, subdivision (b)]." (*Garcia, supra,* 21 Cal.4th at p. 5.)

Turning to the offense at issue in that case, the *Garcia* court stated, "[b]ecause burglary of an inhabited dwelling is listed as 'serious' (§ 1192.7, subd. (c)(18)), but is not listed in [Welfare and Institutions Code] section 707[, subdivision] (b), defendant's prior juvenile adjudication for residential burglary would qualify under paragraph (B), but not under paragraph (D)." (*Garcia, supra*, 21 Cal.4th at p. 5.)

After engaging in a lengthy statutory interpretation analysis (*Garcia, supra*, 21 Cal.4th at pp. 5–13), the *Garcia* court summarized its interpretation of section 667, subdivision (d)(3) as follows:

> "Under paragraph (B), a prior juvenile adjudication qualifies as a prior felony conviction for Three Strikes purposes only if the prior offense is listed in Welfare and Institutions Code section 707[, subdivision] (b) or is classified as 'serious' or 'violent.' Paragraph (D) does not modify or conflict with paragraph (B), but states a separate, additional requirement: the prior adjudication qualifies as

---

35  The *Garcia* court referred to the "four paragraphs of section 667, subdivision (d)(3) simply as paragraphs (A), (B), (C), and (D)." (*Garcia, supra*, 21 Cal.4th at p. 5.)

a prior felony conviction only if the defendant, in the prior juvenile proceeding, was adjudged a ward because of at least one offense listed in section 707(b)." (*Garcia, supra*, 21 Cal.4th at p. 13.)

The *Garcia* court explained that "we interpret paragraph (B) as setting out the list of prior juvenile offenses that will qualify as strikes and paragraph (D) as requiring, in addition, that in the prior juvenile proceeding giving rise to the qualifying adjudication the juvenile have been adjudged a ward of the court because of a Welfare and Institutions Code section 707[, subdivision] (b) offense, whether or not that offense is the same as the offense currently alleged as a strike." (*Garcia, supra*, 21 Cal.4th at p. 6.)

### b. *Assault with a deadly weapon*

Assault with a deadly weapon *is* listed as a serious felony in section 1192.7, subdivision (c)(31). However, assault with a deadly weapon is *not* listed as an offense in Welfare and Institutions Code section 707, subdivision (b).

### c. *Estoppel*

"[D]efendants are estopped from complaining of sentences to which they agreed." (*People v. Hester* (2000) 22 Cal.4th 290, 295 (*Hester*).) Specifically, " '[w]hen a defendant maintains that [a] trial court's sentence violates rules which would have required the imposition of a more lenient sentence, yet the defendant avoided a potentially harsher sentence by entering into the plea bargain, it may be implied that the defendant waived any rights under such rules by choosing to accept the plea bargain.' [Citation.]" (*Ibid.*) This is because "[c]ontractual principles govern a negotiated admission, and the general rule is that ' "[a] defendant may not retain the favorable aspects of his negotiated disposition and at the [same]

time jettison its unfavorable aspects." ' " (*In re Travis J.* (2013) 222 Cal.App.4th 187, 198 (*Travis J.*).)

Estoppel may be found even where, in a prior action, a "trial court fails to act within the manner prescribed by . . . law," or, stated differently, "act[s] in excess of jurisdiction." (*People v. Chavez* (2018) 4 Cal.5th 771, 780 (*Chavez*); see *People v. Ellis* (1987) 195 Cal.App.3d 334, 343 (*Ellis*) [concluding that "trial court acted in excess of its statutory jurisdiction," in accepting admission to prior serious felony allegation "but [did] not [act] in excess of its fundamental jurisdiction"].)[36]  That is because " 'ordinary' jurisdiction, unlike fundamental jurisdiction,[37] can be conferred by the parties' decisions—such as a decision not to object to any perceived deficiency—and so is subject to defenses like *estoppel*, waiver, and consent." (*Chavez, supra*, 4 Cal.5th at p. 780, italics added.)

For example, in *Miller, supra*, 202 Cal.App.4th 1450, the defendant was charged with diazepam possession as a felony (*id.* at p. 1453) and he pled guilty to the charged offense. (*Id.* at p. 1454.) In fact, diazepam possession is "at most a misdemeanor." (*Id.* at p. 1452.) Approximately five years after entering his guilty plea, and after having "apparently [been] caught in possession of a firearm," (*id.* at p. 1461) defendant sought to collaterally attack his plea and modify his prior conviction to a misdemeanor. (*Ibid.*) The *Miller* court concluded that the defendant was precluded from having his plea vacated and his conviction modified. (*Id.* at p. 1458.) The *Miller* court reasoned in part:

---

[36]  We discuss *Ellis* in detail, *post*.

[37]  The *Chavez* court explained that "[f]undamental jurisdiction is, at its core, authority over both the subject matter and the parties." (*Chavez, supra*, 4 Cal.5th at p. 780.)

47

"Before sentencing, [defendant] was advised of the collateral consequences of a plea agreement. He and his attorney signed documents acknowledging the same. [Defendant's] admission his conduct constituted a felony conceded he had engaged in some conduct rising to the level of a felony. [Citation.] . . . [T]his case does not involve a situation where an innocent person was convicted or where the legal mistake was so egregious that vacating the plea is the only equitable result." (*Id.* at pp. 1459–1460.)

The *Miller* court ultimately concluded that the defendant had "stipulated through his plea to a felony." (*Miller, supra*, 202 Cal.App.4th at p. 1461.)

When determining whether to apply the doctrine of estoppel with respect to a plea bargain in the context of a prior conviction, courts have considered whether applying the doctrine would prevent the defendant from obtaining an unfair benefit from the plea. For example, in *People v. Level* (2002) 97 Cal.App.4th 1208 (*Level*), the defendant suffered a robbery conviction in 1987 as an adult, when in fact she had been only 17 years old at the time of commission of the robbery. (*Id.* at p. 1209.) In a subsequent proceeding, the People charged the defendant with certain offenses and alleged the prior robbery conviction as a strike offense. (*Id.* at p. 1210.) The defendant moved to strike the prior strike allegation, contending that she had been only 17 years old at the time she committed the prior robbery. (*Ibid.*) The *Level* court explained that "[defendant's] conviction would qualify as a strike if treated as an adult conviction, but would *not* qualify as a strike if treated as a juvenile adjudication because the record of conviction [did] not reflect that she committed the robbery while armed with a dangerous or deadly weapon." (*Level, supra*, 97 Cal.App.4th at p. 1210, italics added, citing, inter alia, *Garcia*, 21 Cal.4th at p. 13.) The *Level* court concluded that the defendant was estopped from raising such a challenge:

48

"We . . . conclude that [defendant] is estopped from asserting any rights she had as a juvenile in the prior action. 'A defendant may not retain the favorable aspects of his negotiated disposition and at the same time jettison its unfavorable aspects. [Citation.]' [Citation.] [Defendant] agreed to be sentenced as an adult on the robbery count in exchange for the dismissal of two other counts, and she has long since completed her prison sentence. Having enjoyed the fruits of her negotiated disposition, she cannot now be heard to complain that the court exceeded its jurisdiction in convicting and sentencing her as an adult. 'A litigant who has stipulated to a procedure in excess of jurisdiction may be estopped to question it when "To hold otherwise would permit the parties to trifle with the courts." ' " (*Level*, at p. 1213.)

The *Level* court concluded in relevant part:

"[Defendant] is precluded by . . . estoppel from asserting her minority as a basis for challenging her prior robbery conviction. That conviction qualifies as a strike under section 667, subdivision (d)(1). The trial court did not err in denying appellant's motion to strike." (*Level, supra*, 97 Cal.App.4th at p. 1214.)

In *Ellis, supra*, 195 Cal.App.3d 334, the court considered whether "a defendant, as part of a plea bargain, can lawfully admit that a prior conviction for federal bank robbery is a serious felony even though it does not include all the elements of any serious California felony as a matter of law." (*Id.* at p. 336.) The *Ellis* court concluded that, while California law does not permit a defendant to admit that an offense qualifies as a serious felony when, as a matter of law, it does not, the "defendant [was] estopped to urge the error on the record before us." (*Id.* at p. 337.)

In explaining its reasoning, the *Ellis* court first acknowledged that the defendant was admitting a legal falsehood, and that the trial court's act of imposing the serious felony enhancement was in excess of its statutory

49

authority and jurisdiction. (*Ellis, supra*, 195 Cal.App.3d at p. 342.) However, the *Ellis* court considered "whether defendant, by her consent to the plea bargain . . . should be estopped from later asserting a claim of error." (*Id.* at p. 343.)

In considering this issue, the *Ellis* court outlined various public policy interests at stake in determining whether estoppel should preclude a later claim of error, including whether permitting a defendant who has " 'stipulated to a procedure in excess of jurisdiction,' " would allow the party " ' "to trifle with the courts." ' " (*Ellis, supra*, 195 Cal.App.3d at p. 343.) The *Ellis* court explained that while it had "no doubt that strong public policy countenances against allowing defendants to plead guilty to crimes they did not commit," (*id.* at p. 345) "the law also has a strong interest in seeing to it that defendants do not unfairly manipulate the system to obtain punishment far less than that called for by the statutes applicable to their conduct." (*Id.* at p. 345.)

The *Ellis* court also observed that the case did not involve a situation in which an innocent person was convicted, or where the legal mistake was of such a magnitude of unfairness that vacating the plea agreement was the only equitable solution. (*Ellis, supra*, 195 Cal.App.3d at pp. 344, 346.) In addition, the *Ellis* stated that the defendant had plausible tactical reasons for admitting the serious felony, noting that "the unmistakable inference is that the plea agreement was premised on defendant's ability lawfully to admit the prior serious felony."[38] (*Id.* at p. 346.) Under these circumstances, the *Ellis*

---

[38] The *Ellis* court explained that the plea to the serious felony was part of a plea agreement that provided that the defendant could receive a maximum sentence of 9 years and that the "defendant faced a possible term of imprisonment of 12 years if she lost the 9-year 'lid' and was convicted on all counts." (*Ellis, supra*, 195 Cal.App.3d at p. 347.)

50

court "h[e]ld defendant is estopped to attack her admission of, and the trial court's imposition of sentence upon, the prior serious felony." (*Id*. at p. 347.)

### 3. *Factual and procedural background*

#### a. *The strike allegation*

In the operative amended information, the People alleged that, on December 17, 2015 in JCM237568, Martinez suffered a prior "conviction[ ] and juvenile adjudication[ ]," for a violation of section 245, subdivision (a)(1) that constituted a serious or violent felony (i.e., a strike).

#### b. *The court trial on the strike allegation*

After the jury returned its verdicts on the charged offenses in this case, the trial court held a court trial on the strike allegation. The People offered in evidence various records from JCM237568. Those documents included the petition in JCM237568 alleging the following offenses and special allegations: attempted carjacking (§§ 664, 215) with the personal use of a deadly weapon (§ 1192.7, subd. (c)(23)) (count 1); assault with a deadly weapon (§ 245, subd. (a)(1)) with the personal use of a deadly weapon (§ 1192.7, subd. (c)(23)) (count 2); resisting a peace officer (§ 148, subd. (a)(1)) (count 3); battery (§ 242) (count 4); and attempted robbery (§ 664, 211) (count 5).

The People also lodged a December 17, 2015 minute order from JCM237568 in which the juvenile court found that Martinez admitted having committed a violation of section 245, subdivision (a)(1). The minute order also states:

> "Minor is advised that by his admission to count 2, he is admitting to a strike offense and is also advised of the consequences." (Some capitalization omitted.)

The minute order indicates further that the juvenile court dismissed the remaining charges and allegations in the petition.

At the court trial on the strike allegation in this case, two probation officers from JCM237568 identified Martinez as the person who was charged in the proceedings in JCM237568.

At the conclusion of the proceeding, the trial court found that Martinez was the individual who had suffered the juvenile adjudication in JCM237568.[39] The court further determined:

> "So[,] I do find that he was a ward of the court. It does indicate that he admitted to a true finding for [section] 245[, subdivision] (a)(1). At the time he was making the admission, he was advised that it was a strike conviction. I think therefore the People have met their burden with regards to the [section] 667[, subdivisions] (b)-(i) and [section] 1170.12 prior in the amended information for the true finding on the [section] 245[, subdivision] (a)(1) as to identity and to content. So[,] I will find that the strike prior has been proven."

c. *Martinez's motion to reconsider the trial court's strike ruling*

Prior to sentencing, Martinez filed a brief requesting that the trial court "re[ ]consider its prior ruling," that Martinez's juvenile adjudication in JCM237568 was a strike.[40] After explaining that a juvenile adjudication constitutes a strike if it meets the four criteria (A through D) outlined in *Garcia, supra*, 21 Cal.4th 1, and in part III.B.2.a, *ante*, Martinez argued in relevant part:

> "The defense does not dispute that . . . Martinez was 16 years and 16 days old at the time of the subject juvenile

_____

[39] Martinez does not dispute on appeal that he is the individual who suffered the juvenile adjudication in JCM237568. The only issue presented on appeal is whether that adjudication constitutes a strike.

[40] Martinez also filed a separate motion to strike the prior strike conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 and section 1385.

offense thus satisfying A) above.  The defense does not dispute that the juvenile true finding of violating [section] 245[, subdivision] (a)(l) felony is a crime listed under [section] 667[, subdivision] (d)(l) thus satisfying B) above. The defense does not dispute that Mr. Martinez was 'found to be a fit and proper subject to be dealt with under the juvenile court law' satisfying C) above.

"The defense *does* dispute that . . . Martinez's juvenile true finding for violating [section] 245[, subdivision] (a)(l) is an offense listed in subdivision (b) of Section 707 of the Welfare and Institutions Code. . . . [Welfare and Institutions Code, section 707, subdivision (b)] does not list 'assault with a deadly weapon.' " (Italics added.)

Martinez argued, pursuant to *Garcia,* that the People could therefore not establish that he had been adjudged a ward of the court because of a Welfare and Institutions Code section 707, subdivision (b) offense, as required under paragraph (D) of section 667, subdivision (d)(3) to prove that he had suffered a strike offense.

d. *The People's response to Martinez's motion to reconsider*

The People filed a response in which they argued that the trial court should deny Martinez's motion to reconsider its prior ruling.  The People maintained that in *In re Pedro* C*., supra*, 215 Cal.App.3d 174, the Court of Appeal concluded that assault with a deadly weapon "falls within the purview of [Welfare and Institutions Code] section 707, subdivision (b)," (quoting *id*. at p. 183), even though assault with a deadly weapon is not "specifically enumerated," in that statute.  The People also argued that Martinez had "admitted to . . . section 245 [, subdivision] (a)(l) on the record as 'a strike,' " in the juvenile proceeding.

The People lodged the transcript from the plea hearing in JCM237568 as an attachment to their response. At the outset of that hearing, defense counsel stated the following:

> "A resolution has been reached in this case, your Honor. [Martinez] will be pleading [guilty] to Count 2, [section] 245[, subdivision] (a)(1) with no enhancement, [y]our [h]onor. Upon successful completion of probation with no violations, [Martinez] will be able to withdraw his plea to a [section] 245[, subdivision] (a)(4). *[Section] 245[, subdivision] (a)(1) is a [Welfare and Institutions Code section] 707, [subdivision] (b) [offense] and a strike.* If he is able to withdraw his plea *he will withdraw his plea to a strike.*[41] It will still be a [Welfare and Institutions Code section] 707[, subdivision] (b) offense." (Italics added.)

Thereafter, the court stated:

> "[Mr. Martinez], I want to make sure you understand the offer from the District Attorney's office. You are going to be admitting to what's been alleged in Count 2 of the petition, a violation of . . . [s]ection 245[,] subdivision (a)(1), assault with a deadly weapon. If you admit to Count 2, the People will dismiss the attached allegation and the balance of the petition. And if you successfully complete probation with no violations, the [district attorney] is going to allow you to withdraw your plea to [section] 245 (a)(1) and plead to a [section] 245 (a)(4), which would be assault with force likely to produce great bodily [injury], which would not be a strike[,] but would be a [Welfare and Institutions Code section] 707[, subdivision] (b) offense. [¶] Is that the offer from the People?"

The prosecutor responded in the affirmative. Defense counsel and Martinez each stated that this was their understanding of the offer, as well.

Later during the plea hearing, the following colloquy occurred:

---

41    There is no evidence that Martinez ever withdrew his plea and Martinez does not argue that he ever did so.

54

"The court: Also do you understand this charge qualifies as a strike offense?

"[Martinez]: Yes.

"The court: Do you understand that means if you are convicted for a felony as an adult for which you go to state prison, an admission to this charge would double the straight prison time.  Do you understand that?

"[Martinez]: Yes.

"The court: Do you also understand this charge qualifies as a [Welfare and Institutions Code section] 707[, subdivision] (b) offense?

"[Martinez]: Yes.

"The court: That means you can never have your juvenile record sealed.  Do you understand that?

"[Martinez]: Yes.

"The court: It also means you could be sentenced to the Department of Juvenile Justice on this case.  Do you understand that?

"[Martinez]: Yes.

"The court: As to what's been alleged in Count 2 of this petition, on or about September 10th of this year, you violated [section] 245[, subdivision] (a)(1), assault with a deadly weapon.  Do you wish to admit or deny?

"[Martinez]: Admit."

Upon the trial court's acceptance of Martinez's admission, the People moved to dismiss the balance of the petition.  The trial court granted the motion.

e. *The trial court's ruling that the People failed to demonstrate that Martinez had suffered a prior strike adjudication*

The trial court held a hearing at which it heard argument on Martinez's motion to reconsider its strike ruling. The prosecutor argued:

> "I have attached the transcript [from the prior juvenile proceeding] . . . . I think it is important for the Court to consider, and for any appellate court to consider in this matter because, one, it confirms that [Martinez], indeed, was advised that this was a strike, was advised that he could withdraw his plea and enter a non-strike . . . ."[42]

After hearing argument, the trial court reconsidered its prior ruling. The court explained that the People had proven that the "true finding occurred." However, after discussing *In re Pedro C.* and *Garcia*, the trial court stated that it was "reversing [its] earlier decision in which [it] found the true finding of the . . . section 245[, subdivision] (a)(1), assault with a deadly weapon, to qualify as an adult strike prior conviction under Penal Code section[s] 667(b)-(i) or 1170.12."[43] The court added, "I want to make it very clear, I am not exercising my 1385 discretion. I am not striking the strike because I think the defendant falls outside the parameters of three strikes."

4. *Application*

We assume for purposes of our decision that a juvenile adjudication for assault with a deadly weapon (§ 245, subd. (a)(1)) is *not* a Welfare and

---

[42]    At the hearing, the trial court overruled Martinez's objection to the court's consideration of the transcript in JCM237568. Martinez presents no argument on appeal as to this ruling.

[43]    As noted in footnote 32, *ante*, the People did not present an estoppel argument in the trial court. In addition, the trial court did not discuss estoppel in its ruling.

Institutions Code section 707, subdivision (b) offense.[44]  Notwithstanding this assumption, "[t]here remains the question whether [Martinez], by [his] consent to the plea bargain . . . , should be estopped from later asserting a claim of error." (*Ellis, supra*, 95 Cal.App.3d at pp. 342–343.)  For the following reasons, we conclude that Martinez should be estopped in this case from contesting whether his prior juvenile adjudication is a strike offense.

To begin with, in the prior juvenile proceeding, Martinez expressly agreed, on the record, that his juvenile adjudication was both a Welfare and Institutions Code section 707, subdivision (b) offense and a strike offense.

Further, the record is clear that Martinez's agreement that the juvenile adjudication constituted a strike offense was a component of his plea agreement.  Defense counsel explained that if Martinez were able to complete probation successfully and withdraw his plea, Martinez would "withdraw his plea to a [strike]."  Further, in exchange for his plea, the People agreed to, and did in fact, dismiss the "balance of the petition," which included numerous charged offenses and allegations.  Thus, in seeking to set aside a component of his plea, namely, that he was pleading to a strike offense, Martinez seeks to " ' "retain the favorable aspects of his negotiated disposition and at the [same] time jettison its unfavorable aspects." ' " (*Travis J., supra*, 222 Cal.App.4th at p. 198.)  To allow Martinez to "enjoy[ ] the fruits of [his] negotiated disposition," (*Level, supra*, 97 Cal.App.4th at p. 1213) while permitting him to cast aside an " ' "unfavorable aspect[ ]" ' "

_____

[44]    We emphasize that we make this assumption solely for purposes of this opinion and, as we stated in footnote 31, *ante*, we do not reach the merits of the People's contention that Martinez's juvenile adjudication for assault with a deadly weapon (§ 245, subd. (a)(1)) constitutes a Welfare and Institutions Code section 707, subdivision (b) offense under the reasoning of *In re Pedro C.*

(*Travis J., supra*, at p. 198) would allow him to obtain an unfair benefit from the plea that neither party to the plea agreement intended.

The application of the doctrine of estoppel is not precluded by the juvenile court's assumed legal error in accepting Martinez's plea to an assault with a deadly weapon as a strike. Even though the trial court may be assumed to have "acted in excess of its statutory jurisdiction," (*Ellis, supra*, 195 Cal.App.3d at p. 343) in accepting Martinez's plea to an assault with a deadly weapon as a strike, Martinez "stipulated through his plea" that the offense was a strike offense. (*Miller, supra*, 202 Cal.App.4th at p. 1460 [defendant who pled to charged offense as a felony estopped from challenging its felonious nature notwithstanding that offense was, under California law, a misdemeanor].) Even assuming that Martinez did not affirmatively intend to mislead the court in pleading to an assault with a deadly weapon as a strike in the prior juvenile proceeding, this does not preclude the application of the doctrine. (See *Id.* at p. 1458 [stating that the doctrine of estoppel "does not require evidence that one of the parties was 'trifling' with the court"].)[45]

---

[45] The parties and the juvenile court may also have been incorrect in suggesting that, if Martinez were to be allowed to withdraw his plea to assault with a deadly weapon (§ 245, subd. (a)(1)) and to plead to an assault with force like to produce great bodily injury (§ 245, subd. (a)(4)), he would *not* be pleading to a strike. As was true at the time of Martinez's plea, assault with force like to produce great bodily injury *is* an offense specified in Welfare and Institutions code, section 707, subdivision (b). (See Welf. & Inst. Code, §707, subd. (b)(14).) Thus, it appears that a juvenile adjudication for such an offense *would* constitute a strike under *Garcia, supra*, 21 Cal.4th at pages 4–5, even though an adult conviction for assault with force likely to produce great bodily injury is neither a "serious" (§ 1192.7, subd. (c)) nor "violent" felony (§ 667.5, subd. (c)) that may serve, by itself, as a strike offense. (*People v. Fox* (2014) 224 Cal.App.4th 424, 434, fn. 8 [assault with force likely to produce great bodily injury is not, by itself, a strike offense; but see *Garcia, supra*, 21 Cal.4th at p. 11 ["The question whether section 667, subdivision (d)(3) can be constitutionally applied to a felon whose alleged

Further, Martinez was advised of the consequences of his admission to a strike, including the juvenile court having admonished him, "[I]f you are convicted for a felony as an adult for which you go to state prison, an admission to this charge would double the straight prison time." (See *Miller, supra*, 202 Cal. App.4th at p. 1459 [estopping defendant from challenging felony nature of his conviction where "[defendant] was advised of the collateral consequences of a plea agreement"].)

In addition, "this case does not involve a situation where an innocent person was convicted or where the legal mistake was so egregious that vacating the plea is the only equitable result." (*Miller, supra*, 202 Cal. App.4th at pp. 1459–1460.) Indeed, by entering into the plea agreement in the prior juvenile case, Martinez obtained the dismissal of four additional charged offenses and two special allegations. Thus, Martinez had plausible tactical reasons for admitting to a strike offense, and "the unmistakable inference is that the plea agreement was premised on [Martinez's] ability lawfully to admit" to a strike offense. (*Ellis, supra*, 195 Cal.App.3d at p. 346.) Under these circumstances, Martinez should be "estopped to attack [his] admission" to his commission of a strike offense. (*Id.* at p. 347.)

Martinez's arguments to the contrary are not persuasive. First, he asserts that, with respect to the plea hearing in the juvenile case, "it is pure speculation whether Martinez had admitted his violation of section 245, subdivision (a)(1), was a serious felony (§ 1192.7, subd. (c)(31)), or that he was admitting it was a [Welfare and Institutions Code section] 707[,subdivision]

---

prior conviction is for an offense listed in Welfare and Institutions Code section 707(b), but not categorized as a serious or violent felony, must await a case in which it is actually presented"].) We need not consider this matter further because there is no evidence that Martinez ever attempted to withdraw his plea and Martinez presents no argument on appeal pertaining to this apparent misconception by the parties.

(b) offense . . . ." We disagree.  As noted in part III.B.3.d, *ante*, during the plea hearing in the prior juvenile proceeding, the following colloquy occurred:

> "The court: Also, do you understand this charge qualifies as a strike offense?
>
> "[Martinez]: Yes.
>
> "The court: Do you understand that means if you are convicted for a felony as an adult for which you go to state prison, an admission to this charge would double the straight prison time.  Do you understand that?
>
> "[Martinez]: Yes.
>
> "The court: Do you also understand this charge qualifies as a [Welfare and Institutions Code section] 707[, subdivision] (b) offense?
>
> "[Martinez]: Yes."

Thus, Martinez expressly stated that he understood that he was admitting to a strike offense, which would be true under *Garcia* only if he was admitting to a Welfare and Institutions Code section 707, subdivision (b) offense.  Martinez *also* stated that he understood that he had committed a Welfare and Institutions Code section 707, subdivision (b) offense.  Thus, it does not require speculation to determine that Martinez admitted having committed a strike offense and a Welfare and Institutions Code section 707, subdivision (b) offense in the juvenile proceeding.

Martinez also argues that the doctrine of *collateral* estoppel, which he contends may be "used to bar a party from relitigating identical factual issues that were actually and necessarily decided against the party in a prior final judgment," does not apply here because the issue presented in this case "represents a pure question of law."  None of the cases cited by the People in

60

their brief on appeal, including *Travis J.*, *Level*, or *Hester*, nor any of the cases on which we rely in deciding the People's appeal, including *Miller* or *Ellis*, involve *collateral* estoppel. Rather, these cases involve "simple estoppel, which generally provides that a party is barred from taking certain positions contrary to their previous actions, such as consenting to a plea agreement." (*Miller, supra*, 202 Cal.App.4th at p. 1456, fn. 5.) Thus, Martinez's contention that the People are not entitled to reversal of the judgment because they have not demonstrated the elements of *collateral* estoppel, is unpersuasive.

In sum, we conclude that Martinez is estopped from claiming that his prior juvenile adjudication for assault with a deadly weapon (§ 245, subd. (a)(1)) is not a strike offense. We further conclude that the trial court erred when it determined that Martinez's juvenile adjudication is not a qualifying prior strike offense.

Accordingly, we reverse the trial court's order determining that the People did not establish that Martinez's juvenile adjudication for assault with a deadly weapon (§ 245, subd. (a)(1)) qualifies as a strike. In light of the error, the matter must be remanded for resentencing.[46]

## IV.

## DISPOSITION

Martinez's first-degree murder conviction is affirmed. The gang enhancement true finding (§ 186.22, subd. (b)(1)) and the related firearm / gang enhancement true finding (§ 12022.53, subds. (d), (e)(l)) are reversed.

---

[46] We emphasize that Martinez is entitled to a full resentencing hearing, including the court's consideration of Martinez's motion requesting that the trial court exercise its discretion to strike the strike pursuant to section 1385 and *Romero*, and any other appropriate presentencing motions that Martinez files on remand.

The trial court's ruling that the People did not establish that Martinez's juvenile adjudication for assault with a deadly weapon (§ 245, subd. (a)(1)) qualifies as a strike is reversed.

The matter is remanded to the trial court with directions to permit the People to retry the gang enhancement allegation (§ 186.22, subd. (b)(1)) and the related firearm / gang enhancement true allegation (§ 12022.53, subds. (d) and (e)(l)).  If the People elect not to retry these allegations, or at the conclusion of any retrial, the trial court shall conduct a full resentencing hearing and resentence Martinez.

At the conclusion of resentencing, the trial court shall ensure that the judgment states the correct number of custody credits and shall prepare a new abstract of judgment to state the proper recipient of the court's restitution order.

AARON, Acting P. J.

WE CONCUR:

IRION, J.

DATO, J.